UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                    :

RAY LEGAL CONSULTING GROUP,       :
                                      :

                   Plaintiff,    :

                                      :

                  v.            :

                                      :

ARNOLD E. DiJOSEPH III and        :
ARNOLD E. DiJOSEPH, P.C.,         :

                                      :

                Defendants. :

                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: April 12, 2016

13 Civ. 6867 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

     This Opinion puts to rest a claim that, at its core, seeks to hold an attorney liable for doing no more than representing his client.  Plaintiff Ray Legal Consulting Group's sole remaining claim in this case is one of tortious interference with a contractual relationship; it is brought against attorney Arnold E. DiJoseph III, and his firm, Arnold E. DiJoseph, P.C. (together, the "DiJoseph Defendants" or "Defendants").  Defendants have moved for summary judgment dismissing Plaintiff's claim.  For the reasons stated in this Opinion, Defendants' motion is granted.

## BACKGROUND[1]

### A.    Factual Background

     The Court assumes familiarity with the facts detailed and conclusions reached in its August 8, 2014 Opinion and Order (the "Opinion") in this case.

---

[1]     The facts set forth herein are drawn, to the extent they are appropriately set forth therein, from Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1") (Dkt. #95); the Declaration of Arnold E. DiJoseph in Support of

(Dkt. #45).  Nevertheless, a brief summary of the relevant facts helps to frame the Court's analysis of Defendants' motion.

The instant litigation stems from multiple, interlocking employment disputes: It began when Deloitte Touche Tohmatsu Services, Inc. and Deloitte Touche Tohmatsu Limited (together, "Deloitte") terminated the employment of Victor Caldwell, prompting Caldwell to retain attorney Stacey M. Gray in November 2011 to represent him in negotiations with his now-former employer. (Def. 56.1 ¶¶ 1-2).  Approximately six weeks later, in December 2011, Caldwell terminated Gray as his counsel, and Gray retained her own counsel to represent her in a fee dispute with Caldwell.  In relevant part, Gray asserted that she was entitled to a lien on any settlement proceeds received by Caldwell from Deloitte as compensation for the services she rendered, a point which Caldwell contested.  (*Id.* at ¶¶ 3-4, 9).  Gray initially retained Leonard Benowich as counsel, but replaced him with Defendants on February 2, 2012.  (*Id.* at ¶¶ 9, 11).

---

Defendants' Motion for Summary Judgment ("DiJoseph Decl.") (Dkt. #97) and the exhibits attached thereto; Plaintiff's Counter-Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1 Opp.") (Dkt. #101); the Declaration of John Ray in Opposition to Defendants' Motion ("Ray Decl.") (Dkt. #99) and the exhibits attached thereto; and Defendants' Reply to Plaintiff's Counter-Statement ("Def. 56.1 Reply") (Dkt. #104).  With the exception of Exhibit D, the exhibits to the DiJoseph Declaration are not paginated.  The Court therefore uses the page numbers assigned by the Court's Electronic Case Filing ("ECF") system when citing to specific pages of those exhibits.  For convenience, Defendants' opening brief is referred to as "Def. Br." (Dkt. #96); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #98); and Defendants' reply brief as "Def. Reply" (Dkt. #102).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c)-(d).

After Caldwell terminated Gray, he retained Plaintiff to represent him in his ongoing negotiations with Deloitte.  (Pl. 56.1 Opp. ¶ 30).  On January 25, 2012, Plaintiff — through its individual member attorney, John Ray — met to discuss settlement of the matter with Michael Bellinger, an attorney from the law firm of Arent Fox LLP ("Arent Fox"), which then represented Deloitte.  (*Id.* at ¶ 31).  At the conclusion of their conversation, Ray and Bellinger shook hands and parted ways; whether those actions betokened an enforceable settlement agreement is the crux of the instant motion.  Over the course of the coming months, Ray and Bellinger exchanged numerous emails regarding the terms of their agreement.  (DiJoseph Decl. Ex. N).  Meanwhile, Gray continued to assert her right to a lien on any settlement funds paid to Caldwell by Deloitte. (DiJoseph Decl. Ex. E, F, G).

On February 8, 2012, Bellinger made clear to Plaintiff that unless a confidentiality agreement were executed, there would be no settlement. (DiJoseph Decl. Ex. J).  Accordingly, Plaintiff, Defendants, and Arent Fox entered into such an agreement (the "Confidentiality Agreement") on February 10, 2012.  (*Id.*).  Among the Confidentiality Agreement's terms was a provision placing a portion of any settlement funds into an escrow account, with those funds serving as the sum total of legal fees to be paid by Deloitte to Caldwell's counsel.  (*Id.*).  The apportionment of those funds between Plaintiff and Gray was to be determined either through court order or binding arbitration.  (*Id.*).

Caldwell and Deloitte executed a written settlement agreement (the "Settlement Agreement") on April 17, 2012.  (DiJoseph Decl. Ex. L).  As with the

Confidentiality Agreement, the Settlement Agreement required that a sum certain be placed in escrow pending the resolution of Gray's fee dispute with Caldwell.  (*Id.*).  Throughout these proceedings, Plaintiff and Gray disputed both the proper apportionment of the attorneys' fees that had been escrowed on account of Gray's asserted lien, and the antecedent issue of whether Gray had a right to file a lien in the first instance.

## B.    Procedural Background

After unsuccessful attempts to resolve the disputes between and among Gray, Plaintiff, and Caldwell, including: (i) a New York State Supreme Court action filed by Caldwell, (ii) an action filed by Caldwell pursuant to the Attorney Fee Dispute Resolution Program, and (iii) a New York State Supreme Court action filed by Gray against Plaintiff and removed to federal court, Plaintiff filed its Complaint with this Court on September 26, 2013.  (Dkt. #1).[2]  The Complaint named as defendants DiJoseph and his firm; Gray and her firm, Stacey M. Gray, P.C. ("the Gray Defendants"); Arent Fox; and Deloitte.  Plaintiff alleged tortious interference with contract, tortious interference with prospective economic advantage, and civil conspiracy against the DiJoseph and Gray Defendants; breach of fiduciary duty against Deloitte and Arent Fox; and breach of the covenant of good faith and fair dealing against all defendants. (*Id.*).

---

[2]     That same day, Plaintiff additionally filed a separate suit against Gray and her firm, *Ray Legal Consulting Group* v. *Gray*, 13 Civ. 6866 (KPF), seeking to resolve entitlement to the escrowed attorneys' fees.  That matter was dismissed as barred by *res judicata* on August 8, 2014.  *See Ray Legal Consulting Grp.* v. *Gray*, 37 F. Supp. 3d 689 (S.D.N.Y. 2014).

All of the originally-named defendants moved to dismiss the Complaint. (Dkt. #22, 25, 28).  Following briefing on the motions to dismiss, the Court issued its August 8, 2014 Opinion dismissing all of Plaintiff's claims, with the exception of Plaintiff's claim for tortious interference with contract against the DiJoseph and Gray Defendants.  (Dkt. #45).

The DiJoseph and Gray Defendants filed their respective answers to the Complaint on September 29, 2014.  (Dkt. #49, 50).  On November 17, 2014, the Gray Defendants moved to disqualify Plaintiff from representing Caldwell in his deposition in connection with the instant matter.  (Dkt. #59).  Prior to the Court's decision on the motion to disqualify, however, the parties stipulated to the dismissal of the remaining claims against the Gray Defendants, rendering the motion moot.  (Dkt. #68).  Shortly thereafter, on January 28, 2015, the DiJoseph Defendants took up the mantle, filing their own motion to disqualify Plaintiff as Caldwell's counsel.  (Dkt. #71).  Plaintiff filed its opposition on February 19, 2015 (Dkt. #75); Defendants filed their reply on February 25, 2015 (Dkt. #77); and the Court issued an oral opinion denying the motion on May 7, 2015 (*see* Dkt. #78).

Following a discovery period marked by heated disputes between the parties, and repeated intervention and admonitions by the Court (*see, e.g.*, Dkt. #83, 84, 85, 87), Defendants filed the instant motion for summary judgment on October 16, 2015 (Dkt. #90, 91).  Plaintiff filed its opposition on November 16, 2015 (Dkt. #98), and Defendants concluded the briefing with the filing of their reply on November 30, 2015 (Dkt. #102).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." *Celotex Corp.* v. *Catrett,* 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.   A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see also Jeffreys* v. *City of New York,* 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson,* 477 U.S. at 248, 250; *see also Celotex,* 477 U.S. at 323-24; *Wright* v. *Goord,* 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles* v. *General Motors Corp.,* 758 F.2d 839, 840 (2d Cir. 1985)).

## 2. Tortious Interference with Contract

Plaintiff's remaining claim in this case contends that, (i) as of January 25, 2012, Caldwell and Deloitte had an enforceable oral settlement agreement, (ii) that settlement agreement did not contain a provision placing attorneys' fees in escrow, and (iii) as a consequence of Defendants' tortious interference, Deloitte breached its oral contract by requiring the Confidentiality Agreement and its included escrow provision.  Under New York law, a claim for tortious interference with a contract requires:

> [i] the existence of a valid contract between the plaintiff and a third party; [ii] the defendant's knowledge of that contract; [iii] the defendant's intentional procurement of the third party's breach of the contract without justification; and [iv] an actual breach of the contract and damages resulting from such breach.

*Brady* v. *Calyon Sec. (USA)*, 406 F. Supp. 2d 307, 314 (S.D.N.Y. 2005) (citing

*Bradbury* v. *Woller Cope-Schwarz*, 798 N.Y.S.2d 207, 207 (3d Dep't 2005)).

Where, as here, the "contract" at issue consists of an unwritten

settlement agreement, courts within the Second Circuit consider four factors to

determine whether the agreement was indeed binding on the parties. These

factors include:

> [i] whether there has been an express reservation of the
> right not to be bound in the absence of a writing;
> [ii] whether there has been partial performance of the
> contract; [iii] whether all of the terms of the alleged
> contract have been agreed upon; and [iv] whether the
> agreement at issue is the type of contract that is usually
> committed to writing.

*Winston* v. *Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *accord*

*Powell* v. *Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007); *Sawabeh Info. Servs. Co.*

v. *Brody*, 832 F. Supp. 2d 280, 301 (S.D.N.Y. 2011). When applying the

*Winston* factors, "[n]o single factor is decisive"; rather, a court must consider

each within the context of the entire record. *Ciaramella* v. *Reader's Digest*

*Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997).

**B.    Analysis**

**1.    No Enforceable Contract Existed**[3]

Plaintiff asserts that a binding contract was formed between itself and

Bellinger on January 25, 2012. (Pl. Opp. 11-12; *see also* Ray Decl. ¶¶ 7-15).

---

[3]      In addition to contesting the existence of an enforceable oral contract, the parties
disagree as to whether Plaintiff was a party to any such contract. (Def. Br. 14; Pl.
Opp. 14). Because the Court finds that no enforceable contract existed, it need not
decide whether Plaintiff was a party to the alleged agreement. For later analysis in this
Opinion, the Court assumes, for purposes of this motion, that Plaintiff would have been
a party to the agreement had it existed.

Applying the *Winston* factors to the facts at hand, the Court concludes that no reasonable juror could find that the contractual relationship alleged by Plaintiff existed.

### a.   Reservation of the Right Not to Be Bound

Regarding the first element, reservation of the right not to be bound, Plaintiff states that not only was no such reservation made, but that Bellinger's client affirmatively "expressed its assent to be bound by the oral settlement agreement," and that "Bellinger confirmed that . . . the parties had a binding settlement agreement."  (Ray Decl. ¶¶ 12-15).  In particular, Plaintiff recounts that, after their conversation, Ray and Bellinger "shook hands on the oral settlement agreement they had reached at the meeting as a further sign of the Settling Parties' commitment to the oral settlement agreement."  (*Id.* at ¶ 16).

The Court notes as a preliminary matter that Plaintiff's account of Bellinger's statements constitutes inadmissible hearsay.  *See* Fed. R. Evid. 801; *Trebor Sportswear Co.* v. *The Ltd. Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989) ("[I]n order to survive [Defendant's] motion for summary judgment, it was incumbent upon appellants to identify sufficient *admissible* evidence of an agreement so as to demonstrate that there existed a genuine issue of material fact regarding the alleged agreement." (emphasis added)); *cf. Myers* v. *Patterson*, — F.3d —, No. 14-2554-cv, 2016 WL 1397905, at *7 (2d Cir. Apr. 12, 2016) (vacating grant of summary judgment based on finding of qualified immunity and remanding for development of record, where evidence consisted of caseworker notes, with no statements from arresting officer; "It is, of course,

quite possible, that Officer Patterson made observations of Johnson's dangerousness that would support arguable probable cause to arrest her.  But the unsworn argument of an officer's attorney cannot substitute for record evidence.").  Moreover, Bellinger flatly contradicts Plaintiff's account of their conversation — and, as the Court discusses further in this section, so does the documentary record.  *See Scott* v. *Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

During his deposition, Bellinger asseverated that during January and February of 2012, "[t]here was no final settlement agreement.  There were negotiations." (DiJoseph Decl. Ex. D at 29:23-25).  When asked whether Bellinger had entered into an "oral agreement that [the Caldwell] matter was resolved prior to the settlement agreement or the confidentiality agreement" that was executed in April 2012, Bellinger unequivocally answered, "No … certainly there was no enforceable settlement agreement." (*Id.* at 52:21-53:4).  When pressed on the significance of his handshake with Plaintiff at the conclusion of their meeting, Bellinger emphasized that "[i]t was just etiquette," not "a legality," nor was it even necessarily a sign of good faith (*id.* at 81:21-82:4): He explained that "no matter whether I shake someone's hand[] or not there's no deal until it's reduced to a writing and everyone signed it." (*Id.* at 82:11-14).

Bellinger's account of his negotiations with Plaintiff is supported by the contemporaneous documentary evidence in the record.  On January 31, 2012, Bellinger sent an email to Gray stating, "I believe I have forged a settlement between Mr. Caldwell and [my client] …. I would appreciate your input but Thursday may be too late in the settlement process."  (Ray Decl. Ex. 3). Bellinger clearly indicated that he "believe[d]" an agreement has been reached, but solicited Gray's input, thereby indicating that he did not understand the agreement to be in its final form.  Rather, he describes his client as engaged in "the settlement process."  Plaintiff evidenced a similar understanding in its April 15, 2012 email to Bellinger, in which it demanded certain changes to a draft settlement circulated by Bellinger that, if not made, would cause Plaintiff and its client to abandon settlement negotiations and "proceed forward" with litigation.  (DiJoseph Decl. Ex. N at 4).  Thus, the record indicates Plaintiff's own reservation of the right not to be bound absent certain wording adopted in the written agreement.  (*Cf. id.* (April 13, 2012 email from Bellinger stating, "I am sending you what I consider to be a *good faith attempt to settle* this matter *with the proviso* that this does not purport to be the final version." (emphases added)).  Similarly, an email from Bellinger to Plaintiff on April 10, 2012, stated that "the final settlement agreement was provided to you on March 29, 2012," and that Caldwell had until April 19, 2012, to consider it; on that date, "if not accepted it [would] be withdrawn."  (*Id.* at 5).  Hence, the "final settlement agreement" was not presented until March 29, 2012 — nearly two months after Defendants' alleged interference — and even then, Bellinger reserved his

11

client's right to withdraw from the agreement unless acceptance was received within a specified timeframe.  *Cf. Ciaramella*, 131 F.3d at 325 ("[A]n attorney's statement that 'a handshake deal' existed was insufficient to overcome 'months of bargaining where there were repeated references to the need for a written and signed document, and where neither party had ever ... even discussed dropping the writing requirement.'" (quoting *R.G. Grp., Inc.* v. *Horn & Hardart Co.*, 751 F.2d 69, 76 (2d Cir. 1984))).

Considering finally the written agreement itself, the executed Settlement Agreement contains a merger clause stating that it supersedes any preceding written or oral agreements, and cannot be orally modified (DiJoseph Decl. Ex. L at ¶ 25); the Second Circuit has found that "such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella*, 131 F.3d at 324-25 (citing *R.G. Grp., Inc.*, 751 F.2d at 76; *McCoy* v. *New York City Police Dep't*, No. 95 Civ. 4508 (RPP), 1996 WL 457312, at *2 (S.D.N.Y. Aug. 14, 1996)).  Further, the Settlement Agreement states, "If this Agreement does not become effective, it shall be deemed negotiation for settlement purposes only and will not be admissible or usable for any purposes." (DiJoseph Decl. Ex. L at ¶ 28).  In other words, the parties expressly reserved their right not to be bound by the terms of the settlement absent the execution of the written agreement.

In short, the record does not support — and in fact refutes — Plaintiff's claim that the parties affirmatively agreed to be bound by an oral settlement reached on January 25, 2012.  In light of the many objective indications that

12

the parties to the agreement intended to reserve their rights not to be bound absent a writing, the first *Winston* factor weighs against finding the existence of an enforceable oral contract.

### b.      Partial Performance of the Agreement

Plaintiff next argues that its "partial performance" weighs in favor of a binding contract, because Plaintiff and Caldwell "refrained from filing anticipated litigation" as a result of the settlement conversation. (Pl. Opp. 11). This forbearance, however, does not constitute "partial performance" in a manner suggesting the establishment of a binding contract. Partial performance provides a useful indicator of a contract where a party would not undertake the action in question absent the belief that a contract had been formed. In other words, partial performance is most relevant where such performance would not be expected absent a final agreement. Where, as here, however, the "performance" in question consists of forestalling litigation, such performance offers no insight into the status of settlement negotiations. The filing of a claim would provide a clear indication that negotiations had broken down, and that no agreement was or would be reached; Plaintiff's *failure* to file, on the other hand, shows only that settlement was still a possibility. *Cf. Leber* v. *Blackmon*, No. 89 Civ. 5474 (MBM), 1991 WL 19851, at *2 (S.D.N.Y. Feb. 13, 1991) (perpetual release of claims did not constitute "performance" on a settlement contract for purposes of the statute of frauds).

The Court can imagine circumstances in which failure to file an otherwise viable claim might constitute performance relevant to the

determination of a contract, such as where a claim expires due to forbearance in reliance on an oral agreement.  This case presents no such circumstances; on the contrary, Plaintiff continued to threaten litigation against Caldwell's former employer as late as April 15, 2012, using that threat as a bargaining chip in negotiating the language of the written settlement agreement. (DiJoseph Decl. Ex. N at 4 (email from Plaintiff to Bellinger demanding certain changes to the draft agreement and stating that "[i]f your client refuses, we will proceed forward with the EEOC and in court")).  Because Plaintiff's decision to hold off on filing a complaint was entirely consistent with ongoing settlement negotiations, the second *Winston* factor does not suggest the existence of a binding agreement between the parties; rather, it is largely neutral.  *See Case* v. *City of New York*, No. 12 Civ. 2189 (AJN) (AJP), 2012 WL 5951296, at *6 (S.D.N.Y. Nov. 28, 2012) (citing cases in which the second *Winston* factor was neutral).[4]

### c.    Whether the Material Terms Have Been Agreed Upon

The record reflects that the parties did not orally agree upon all material terms of their settlement.  On February 24, 2012, Plaintiff (through Ray) sent an email to Bellinger stating, "[w]e … want to be certain that we [are] on the

---

[4]      While Plaintiff does not assert the steps taken toward consummation of settlement as "partial performance," the Court acknowledges that some courts in this District have considered such steps in assessing the *Winston* factors.  *See Estate of Andrea Brannon* v. *City of New York*, No. 14 Civ. 2849 (AJN), 2016 WL 1047078, at *3 (S.D.N.Y. Mar. 10, 2016) (discussing cases).  Considering the steps taken toward consummation would not, however, support the existence of a contract here in light of both sides' respective failure to accept such performance, as evidenced by their continued threats to walk away from the agreement.  *See Ciaramella* v. *Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 325 (2d Cir. 1997) (stating the second *Winston* factor as considering "whether one party has partially performed, and *that performance has been accepted*" (emphasis added)).

same page, so that [] we are not spinning our wheels if there is no substantive agreement on the material terms, which I understood we had some time ago." (DiJoseph Decl. Ex. N at 14).  Plaintiff thus acknowledges that as of February 24, 2012, it was unclear whether the parties had "substantive agreement on the material terms," Plaintiff's previous impressions notwithstanding.  S*ee Sprint Commc'ns Co.* v. *Jasco Trading, Inc.*, 5 F. Supp. 3d 323, 338 (E.D.N.Y. 2014) (finding no enforceable contract where there was no "meeting of the minds" on the key terms); *Benicorp Ins. Co.* v. *Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) (framing the question as "whether the parties had a *common, mutual understanding*" of the key terms of the agreement (emphasis added)).

Plaintiff's email exchange with Bellinger discloses multiple issues on which the parties had not yet reached agreement following their January 25 conversation.  As of February 8, 2012, Plaintiff and Bellinger had not yet resolved the need for a confidentiality agreement, independent of any escrow conditions.  (DiJoseph Decl. Ex. J (February 8, 2012 email from Bellinger to Ray stating, "The equation is quite simple: no Confidentiality Agreement, no settlement.")).[5]  On February 20, 2012, Ray sent Bellinger an email noting that

---

[5]      Plaintiff contends that this demand for a confidentiality agreement was the direct result of Defendants' tortious interference.  (Pl. Opp. 8).  However, the only "interference" Plaintiff alleges is Defendants' claim of a lien, which led to an escrow provision; nowhere does the record suggest that Defendants made any demands regarding confidentiality.  As Bellinger explained in his deposition, while the Confidentiality Agreement ultimately entered into did contain the now-contested escrow provision, it served the independent purpose of — as the name suggests — establishing the terms of the settlement as confidential.  (DiJoseph Decl. Ex. D at 109).  Thus the record does not support an inference that the need for an escrow provision was the sole motivation behind Bellinger's ultimatum.  Rather, it indicates that confidentiality was, as of February 8, 2012, an unsettled element of any settlement agreement.

there were still outstanding issues, and stating, "we need to finish this agreement this week." (DiJoseph Decl. Ex. N at 17). Subsequent emails discuss unsettled provisions, including the amount of unpaid leave for which Caldwell would receive credit (*id.* at 13 (February 24, 2012 email from Bellinger to Plaintiff, in response to Plaintiff's request for four months' unpaid leave, stating, "We agreed upon TWO months unpaid leave, not FOUR! My notes are clear on that point")); the basis upon which certain damages would be paid to Caldwell (*id.* (February 24, 2012 email from Ray to Bellinger, observing that the proposed draft agreement left out "the 40% nonwithholding allocation to phy[si]cal injury," which, along with unpaid leave, was a "very material term[] to Mr. Caldwell's agreement")); the reciprocity of the release provisions in the agreement (*id.* at 9 (April 2, 2012 email from Plaintiff to Bellinger, stating, "obviously there are still a few kinks in this agreement that we need to iron out. A significant issue is its lack of reciprocity on the release provisions.")); and the effect on the agreement of Caldwell finding new employment (*id.* at 4 (April 13, 2012 email from Bellinger to Plaintiff, noting that certain terms still needed to be sorted out, "such as what happens if Mr. Caldwell were to begin new employment on June 1, 2012?")).

When considering whether all the material terms of an agreement have been agreed upon, the Second Circuit has explained that courts should not retroactively decide that certain changes to an agreement were so "minor" or "technical" as to be of no import to an agreement's binding effect. *Winston*, 777 F.2d at 83; *accord Ciaramella*, 131 F.3d at 325; *Sprint Commc'ns Co. L.P.*, 5 F.

Supp. 3d at 336.  Here, the email correspondence between Plaintiff and Bellinger from February 10, 2012, through April 17, 2012, reflects ongoing negotiations in which the parties themselves referred to outstanding issues as "material" and "significant," with each party threatening to walk away from the agreement should particular terms not be adopted.  To say, on this record, that the parties had an enforceable oral agreement as of January 25, 2012, would confound common sense.  Hence, this factor weighs heavily against finding the existence of an enforceable oral contract.

###        d.        Whether the Agreement Is of a Sort Usually Reduced to Writing

Considering the final *Winston* factor, the Second Circuit has recognized that "[s]ettlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court."  *Ciaramella*, 131 F.3d at 326.  Furthermore, "[w]here, as here, the parties are adversaries and the purpose of the agreement is to forestall litigation, prudence strongly suggests that their agreement be written in order to make it readily enforceable, and to avoid still further litigation."  *Winston,* 777 F.2d at 83.

The complexity of an agreement also informs the determination of whether it would be expected to be reduced to writing.  *Ciaramella*, 131 F.3d at 326; *Winston*, 777 F.2d at 83; *R.G. Grp., Inc.*, 751 F.2d at 76.  The *Winston* Court found, for instance, that a four-page settlement document containing obligations that would extend for a period of years constituted an agreement complex enough to require a writing.  *Winston*, 777 F.3d at 83.  Here, the Settlement Agreement spanned 20 pages and contained highly specific

provisions regarding benefits eligibility, salary payments, and tax treatment of payments made under the agreement. (*See* DiJoseph Decl. Ex. L). Thus, the final factor supports the conclusion that the parties did not enter into an enforceable oral contract.

In sum, three of the four *Winston* factors weigh decisively against the finding of a binding oral agreement between Plaintiff and Bellinger's client, and the fourth does not tip the scales in either direction. Consequently, the Court finds no triable issue of fact that remains on this point. *See, e.g., Adjustrite Sys., Inc.* v. *GAB Bus. Servs., Inc.*, 145 F.3d 543, 551 (2d Cir. 1998) (concluding that three of four factors indicated parties did not intend to be bound until formal documents were executed and therefore summary judgment was appropriate); *Ciaramella*, 131 F.3d at 326 (vacating, based on "the totality of the evidence," the district court's determination that a binding agreement was reached); *Arcadian Phosphates, Inc.* v. *Arcadian Corp.*, 884 F.2d 69, 72-73 (2d Cir. 1989) (affirming grant of summary judgment notwithstanding considerable partial performance, where language of memorandum showed that parties did not intend to be bound until final contract was signed); *Winston*, 777 F.2d at 83 (reversing district court after concluding that parties were not bound to preliminary settlement agreement, where three of four factors established parties did not intend to be bound until formal documents were executed and delivered). In the absence of a valid contract with which to interfere, Defendants' motion for summary judgment on Plaintiff's tortious interference with contract claim is granted.

### 2. The Heightened Bad Faith Standard Applicable to Tortious Interference with Contract Claims Against Attorneys Has Not Been Met

Even were the Court to find that a triable issue existed regarding the enforceability of Plaintiff's purported oral agreement with Bellinger, Defendants' motion for summary judgment would nevertheless succeed. While tortious interference with contract generally requires intent, a plaintiff asserting tortious interference against an attorney acting on behalf of a client must meet a higher standard: Attorney liability requires either malicious intent or personal interest. *M'Baye* v. *World Boxing Ass'n*, No. 05 Civ. 9581 (DC), 2009 WL 2245105, at *10 (S.D.N.Y. July 28, 2009); *see also Newburger, Loeb & Co.* v. *Gross,* 563 F.2d 1057, 1080 (2d Cir. 1977) ("Under New York law an attorney generally cannot be held liable to third parties for actions taken in furtherance of his role as counsel unless it is shown that he 'did something either tortious in character or beyond the scope of his honorable employment.'" (quoting *Dallas* v. *Fassnacht*, 42 N.Y.S.2d 415, 418 (N.Y. Sup. Ct. 1943))); *Four Finger Art Factory, Inc.* v. *Dinicola*, No. 99 Civ. 1259 (JGK), 2001 WL 21248, at *7 (S.D.N.Y. Jan. 9, 2001) ("[I]f an attorney or any other agent of a contracting party takes actions that induce a breach of contract while acting within the scope of an agency relationship and is not motivated by personal gain, the attorney or agent is not liable to the third party for tortious interference with contract."). The record does not support a finding of either.

Plaintiff does not allege, nor does the record suggest, that Defendants acted in their personal interest; rather, they acted at all times in their capacity

as Gray's counsel.  Plaintiff nevertheless points to (i) Defendants' assertion of a charging lien on Gray's behalf, (ii) Defendants' demand that a portion of the settlement funds paid to Caldwell be placed in escrow pursuant to that lien, and (iii) Defendants' threat to bring litigation on behalf of their client as evidence of Defendants' bad faith.  (Pl. Opp. 12-13).  None of these actions suffices to show the "malicious intent" required to substantiate Plaintiff's claim.[6]

The Engagement Agreement entered into between Gray and Caldwell stated that Gray's firm would "receive one-third (33.3%) of the total amount received by [Caldwell] through a settlement/severance agreement with [his] Employer less any out-of-pocket payments made by [Caldwell] for attorney fees," and that Gray could "put a lien on any settlements, awards and severance amounts for payment of services rendered as well as costs and expenses."  (Ray Decl. Ex. 4 at 3).  Accordingly, on December 21, 2011 — the day Caldwell terminated Gray as his attorney — Gray wrote to counsel for

---

[6]     Plaintiff cites to this Court's earlier decision resolving the motions to dismiss for the proposition that where an attorney asserts a "knowingly false claim[] of a 'statutory charging lien' ... and threats of litigation, with no basis under the law for such a claim, that is bad faith misconduct, and supports a claim for tortious interference, as in this case."  (Pl. Opp. 13 (citing *Ray Legal Consulting Group* v. *DiJoseph*, 37 F. Supp. 3d 704, 721 (S.D.N.Y. 2014))).  Plaintiff mischaracterizes this Court's statements.  In regard to the Court's August 8, 2014 Opinion, the parties had not briefed, nor did this Court discuss, the heightened standard for tortious interference with contract applicable to claims against attorneys.  Rather, the Court observed only that Plaintiff's pleadings satisfied the basic "intent" requirement for a tortious interference with contract claim.  The Court will not now opine on whether, had Defendants raised an argument based on their status as attorneys at the motion to dismiss stage, Plaintiff's surviving claim would, in fact, have survived.  The Court simply notes that the variable intent standard for tortious interference with contract claims was not addressed by this Court previously.  Plaintiff's citation to this Court's prior Opinion and the "cases cited therein" is consequently inapposite.

Caldwell's employer (and copied Plaintiff), stating, "My office will place a lien on Mr. Caldwell's file along with any settlements, awards and severance amounts that [his Employer] pays to [him]." (DiJoseph Decl. Ex. E). That same day, Plaintiff engaged in a series of emails with Gray, accusing her of breaching her professional conduct obligations through her assertion of a settlement lien and asking for the bases of her claim, in response to which Gray referred Plaintiff to her Engagement Agreement with Caldwell. (DiJoseph Decl. Ex. F).[7]  On December 23, 2011, Gray sent Plaintiff a letter "as notice" that she was placing "both a retaining lien and contractual charging lien on Mr. Caldwell's file and any recovery obtained arising out of his dispute with [his Employer]." (*Id.* at 9). Plaintiff and Gray continued to exchange emails, throughout which Gray steadfastly asserted her claimed right to a lien on any recovery received by Caldwell pursuant to "basic contract law." (*Id.* at 9-16).

On February 1, 2012, the day prior to her engagement of Defendants as counsel, Gray wrote to Bellinger and Plaintiff, informing them that "the liens [were] still in effect." (DiJoseph Decl. Ex. G at 2-3). That day, Plaintiff (through Ray) sent multiple emails to Gray's then-counsel, Leonard Benowich, articulating its skepticism of Gray's right to a lien. (*Id.* at 8-14). It further drafted and circulated a notice of petition against not only Gray, but also attorney Benowich, threatening to file if Gray did not agree to settle her claims. (*Id.* at 13; DiJoseph Decl. Ex. H). The draft that Plaintiff circulated including

---

[7]     Somewhat ironically, Plaintiff disputed Gray's assertion of a previous settlement offer "in the absence of a firm proposed agreement as to all material terms in writing." (DiJoseph Decl. Ex. F at 6).

Benowich as a defendant claimed no action taken by Benowich in his personal
capacity, but rather sought declaratory judgment on legal claims that he had
asserted on Gray's behalf.  (*See* DiJoseph Decl. Ex. H at 4-5).

Just as the record suggests no malfeasance on the part of Benowich, it
nowhere suggests that Defendants asserted a charging lien out of malicious
intent; on the contrary, Gray had been claiming the right to a lien since the day
of her termination, and Defendants merely acted as her attorney in continuing
to assert the claim on her behalf.  Plaintiff points to Defendants' lack of
proffered case law as evidence of their "malicious intent," but Gray's claim was
expressly premised on her Engagement Agreement and principles of contract
law; in that context, Defendants' failure to provide their opponent with specific
case citations does not suggest bad faith.  Plaintiff similarly argues that
Defendants' client lacked a valid basis upon which to assert a "statutory
charging lien," as the version of New York Judiciary Law § 475 then in place
did not entitle her to such a lien.  (Pl. Opp. 6, 8, 13-14; Ray Decl. ¶¶ 48-50).
Plaintiff might perhaps be correct in its interpretation of § 475 as it stood in
2012; but Defendants' interpretation of the law was not so beyond the pale as
to suggest, on its own or in combination with other record evidence, that
Defendants' assertion of a lien on behalf of their client was made in "bad
faith."[8]

---

[8]      Until December 31, 2012, New York Judiciary Law § 475 read, in relevant part:

> From the commencement of an action … or the service of an answer
> containing a counterclaim, the attorney who appears for a party
> has a lien upon [her] client's cause of action, claim or counterclaim,
> which attaches to a verdict, report, determination, decision,

Considering next the request that a portion of the settlement funds be placed in escrow, this again does not suggest any "malicious intent" by Defendants.  To the contrary, under New York's Professional Rules of Conduct,

> Funds belonging in part to a client or third person and in part currently *or potentially* to the lawyer or law firm shall be kept in such special account or accounts, but the portion belonging to the lawyer or law firm may be withdrawn when due *unless the right of the lawyer or law firm to receive it is disputed* by the client or third person, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

N.Y.S. R.P.C. Rule 1.15(b)(4) (emphases added).  In other words, Defendants' request that the disputed funds be placed in escrow was the natural and proper consequence, under New York's Professional Rules, of their client's asserted lien against Caldwell.  Certainly, it evinces no malice on the part of Defendants.

---

judgment or final order in [her] client's favor, and the proceeds thereof[.]

N.Y. Jud. L. § 475 (2012).  An amended version of § 475 went into effect on January 1, 2013, providing that:

> From the commencement of an action … or the service of an answer containing a counterclaim, *or the initiation of any means of alternative dispute resolution including, but not limited to, mediation or arbitration, or the provision of services in a settlement negotiation at any stage of the dispute,* the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, *settlement,* judgment or final order in his or her client's favor, and the proceeds thereof[.]

N.Y. Jud. L. § 475 (2013) (emphases added).  Thus, Plaintiff argues, prior to January 1, 2013, when attorneys who appear for settlement purposes were explicitly added to the scope of § 475, Gray was not entitled to a statutory charging lien for her settlement-related services.  (Pl. Opp. 6, 13-14).  The parties have not briefed, and Court declines to opine on, the proper construction of the pre-amendment § 475; suffice it to say that neither the fact of amendment, nor the statute's lack of express reference to settlement counsel prior to 2013, serves to transform Defendants' 2012 assertion of a charging lien on their client's behalf into "bad faith misconduct" sufficient to support a tortious interference claim.

Finally, as to Plaintiff's contention that Defendants "threatened litigation" to protect their client's rights: It may be that Defendants were incorrect in their belief that Gray had a right to a lien on Caldwell's settlement award; but an attorney's incorrect advice is not itself grounds for tortious interference with contract. *Purvi Enterprises, LLC* v. *City of New York*, 879 N.Y.S.2d 410, 412 (1st Dep't 2009) (quoting *Beatie* v. *DeLong*, 561 N.Y.S.2d 448 (1st Dep't 1990)). Defendants informed Plaintiff and Caldwell that their client "intend[ed] to pursue all legal remedies available to her," as their client had a plausible claim to a portion of any settlement Caldwell received.  (DiJoseph Decl. Ex. K).  In this respect, Defendants behaved entirely appropriately.  Inasmuch as Plaintiff previously threatened, and then actually filed, a lawsuit against an attorney for doing no more than representing his client, the Court might hesitate to say the same of Plaintiff.

The evidence in the record indicates that Defendants acted at all times in accordance with and on behalf of their client's interests, and contains no suggestion of personal interest or malicious intent.  As the Court has already discussed, no enforceable oral contract existed between Plaintiff and Caldwell's employer, and Defendants' motion succeeds on that ground; but even had such a contract been in place, no reasonable juror could find that Defendants acted with the heightened intent necessary to find an attorney liable for tortious interference with contract.  For this separate reason, their motion for summary judgment is granted.

## CONCLUSION

For the reasons stated in this Opinion, Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      April 12, 2016
            New York, New York

_____
     KATHERINE POLK FAILLA
   United States District Judge